## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

BARBARA KIM MARSHALL,

|  |  |  |
|---|---|---|
|  | Plaintiff, | OPINION & ORDER |
| v. |  |  |
|  |  | 13-cv-443-wmc |
| PRECISION PIPELINE LLC, |  |  |
|  | Defendant. |  |

---

Plaintiff Barbara Kim Marshall alleges that her former employer, Precision Pipeline LLC, discriminated and retaliated against her in violation of Title VII, as well as tortiously interfered with her prospects for future employment. Specifically, Marshall claims that: (1) Precision Pipeline engaged in sex discrimination by paying her less than male coworkers; and (2) after she complained about this alleged pay differential, Precision Pipeline retaliated by making her working conditions so extreme that she was forced to resign. She also alleges that Precision Pipeline interfered with -- and ultimately sabotaged -- a job offer from another company made after her resignation.

Defendant moves for summary judgment on all of Marshall's claims. (Dkt. #44.) After reviewing the admissible evidence, as well as Marshall's tepid and sometimes non-existent responses to defendant's proposed facts and well-taken arguments, the court agrees that no reasonable trier of fact could find for Marshall on any of her claims and will enter judgment in defendant's favor.

UNDISPUTED FACTS[1]

## A. Background

Defendant Precision Pipeline LLC is a national oil and gas pipeline contractor with a corporate office in Eau Claire, Wisconsin.  Precision Pipeline is in the business of installing underground pipelines for the transportation of oil and gas.  Precision Pipeline has adopted an Equal Employment Opportunity Policy statement and a Freedom from Harassment policy as part of its Employee Working Rules & Policies.  Marshall was familiar with these policies, as well as Precision Pipeline's policy that employees should report suspected discrimination or harassment to the Corporate Safety Director, in writing if possible.  Even so, Marshall never made any such report during her employment.

## B. Job Duties with Precision Pipeline

Precision Pipeline Vice President of Eastern Operations, John "Skip" Holley, and Project Manager, Jeff Taylo, hired Marshall on May 23, 2011, as a "Coating Specialist." Both had worked with Marshall before.

Marshall is certified by the National Association of Corrosion Engineers ("NACE"), a qualification which entails several certificates relating to coating and corrosion.  Specifically, Marshall has current certifications as a Corrosion Technician, Corrosion Technologist, Internal Corrosion Technologist, Cathodic Protection Tester, and CIP from NACE.

---

[1] Defendant points out that plaintiff failed to follow this court's procedures in responding to defendant's proposed findings of fact.  In particular, while purporting to dispute defendant's proposed findings, she neither identified the dispute nor specifically cited to the record to support the dispute's existence, both of which are called for by this court's standing order provided to both sides at the beginning of this lawsuit.  While the court is sympathetic to defendant's argument that any improperly-disputed facts should be deemed admitted, the court will not deem Precision Pipeline's proposed facts admitted wholesale based on Marshall's procedural default alone.  Accordingly, all arguable factual disputes will be resolved in Marshall's favor except where untenable on the record and/or by reasonable inference.

Marshall's starting salary was $3,801.00 per week, plus an extra $500.00 if she worked on Sunday.

Upon Marshall's hiring, Holley and Taylor informed her that one of her job duties would be to find NACE-certified employees to work on projects.  Marshall also had the duties of a coating inspector, requiring her to inspect the coating that is applied to pipes before they are placed in the ground, looking for imperfections and ensuring that the ambient conditions, such as temperature and moisture, are correct at the time coating is applied, so as to prevent corrosion.  Coating inspectors are also required to fill out three-page forms verifying that the coating was performed properly.  One certified coating inspector is expected to observe up to three laborers complete their work.

As a Coating Specialist, Marshall was also expected to perform additional duties, including: (1) assigning coating inspectors to crews each day; (2) monitoring inventory levels of coating materials and supplies and communicating those levels to the on-site warehouse foreman; (3) collecting and compiling daily coating reports from the other Coating Specialists; and (4) ensuring that the proper one-call notifications were placed with the appropriate underground facilities protection organization before scheduled earth disturbance activities.  Marshall also had to ensure crews were adhering to contract specifications.  Among other things, this required her to monitor whether crews were using and properly storing the correct warm-weather or cold-weather coatings.

Marshall was specifically hired to work on three projects for Precision Pipeline: (1) Appalachian Gateway, a project in Waynesburg, Pennsylvania in which Precision Pipeline served as a contractor for Dominion Transmission Inc. ("Dominion"); (2) a project in Cheylan, West Virginia in which Precision Pipeline served as a contractor for Dominion;

3

and (3) the Sunrise Project, a project in Waynesburg, Pennsylvania in which Precision Pipeline served as a contractor for EQT Corporation.  Marshall expected her distribution of work between the three projects to include going to the Cheylan project once every two weeks, with her time otherwise divided such that she would spend 75% on the Dominion Waynesburg project and 25% on the EQT Waynesburg project.  Because the Cheylan project had already begun, and the Dominion Waynesburg and EQT Waynesburg projects did not begin until mid-August and mid-September, respectively, Marshall's job duties from May until August of 2011 included securing road bonds, hiring and training coating inspectors, and finding a site for the construction yard.  She also spent about two days per week assembling office furniture, performing administrative work, waiting for permits, looking at maps, and finding a construction office location.[2]

### C. Deterioration of Employee-Employer Relationship

#### 1. Beginning of the Dominion Waynesburg Project

In the Dominion Waynesburg project, Precision Pipeline was to install more than 50 miles of pipeline.  Marshall's first supervisor on that project was Superintendent Hubert Ross, who served in that capacity from August until November of 2011; she had different supervisors on the other two projects.  While Ross was her supervisor, Marshall estimated she spent about 40% of her time doing inspection work and filling out forms for the Dominion Waynesburg project.[3]

---

[2] At one point, someone also requested that Marshall be permitted to perform the duties of a "CP-2," which the parties do not define, but which the court assumes to be some sort of supervisory role.

[3] Taking all three projects into account, about 80% of Marshall's total time was devoted to inspection work and filling out forms, with the remainder spent checking on other crews.

4

As was typical of Precision Pipeline's other projects, the Dominion Waynesburg project had different crews performing different work.  For instance, the main line crew welds and lays pipe, skipping some sections; the road bore crew bores the pipe underneath major roadways; the hill crew works on steep hillsides; and the tie-in crew fills in the gap in the pipeline left by other crews, bending and burying pipes.  Each crew had a foreman.  There was also supposed to be a NACE-certified coating inspector assigned to each crew, as well as a Dominion employee assigned as a coating inspector to ensure Precision Pipeline was performing the work correctly.  Marshall herself sent five laborers to school to become NACE-certified for this purpose, although only two passed.  Those two were JJ McCollum, foreman of the main line crew, and Josh Nelson.  Jason "Tall Boy" Meier, who was foreman of a tie-in crew, was also NACE-certified.

Between May and August of 2011, Marshall found and hired Brian Hodge and Steven Reed as coating inspectors for the Dominion Waynesburg project with Taylor and Holley's approval.  Hodge was assigned to the hill crew, and Reed to the tie-in crew.  Craig Brennan joined the project as a coating inspector in October of 2011.  Thus, as of October 11, 2011, the NACE-certified employees capable of performing coating inspection on the Dominion Waynesburg project included:  Coating Specialist Marshall; coating inspectors Brennan, Hodge and Reed; and NACE-certified foremen McCollum and Meier.

On the Dominion Waynesburg project, Marshall inspected coating for (1) the hill crew as needed, (2) Meier's crew, when his other foreman duties did not allow time for inspection, (3) the road bore crew, and (4) two tie-in crews.

### 2. Other Foremen on the Project

In August of 2011, Precision Pipeline brought in some foremen from a different project in West Virginia to work on the Dominion Waynesburg project. Those foremen received raises, because the pipeline at the Dominion Waynesburg project was 30 inches in diameter -- larger than the pipeline they had previously been installing -- and so their wages increased to match the wages Precision Pipeline generally paid to foremen working on larger pipes. As with the foremen already assigned to the project, Marshall did not receive a raise at this time.

### 3. Clash with Fischer

Project Superintendent Hubert Ross left Precision Pipeline in November of 2011. His replacement, Russ Fischer, became the Superintendent on the Dominion Waynesburg project as of November 12, 2011. Marshall claims that Fischer adopted a confrontational attitude toward her from the beginning of his involvement on that project. Within a week of Fischer becoming Marshall's supervisor, her job duties changed. Under Fischer's supervision from November 12 until December 22, 2011, Marshall estimated that she spent just 10% of her time performing coating inspections and the remainder of her time on other tasks, such as handling road bonds, dealing with municipalities and moving and setting up trailers. Marshall felt that Fischer was assigning her these other duties to "hinder her" from performing the work she actually needed to do personally.

Although Fischer had not reduced the number of coating inspectors when he became superintendent, Marshall believed there were not enough on the Dominion Waynesburg project. At the first foreman meeting that Fischer attended, Marshall asked him for more coating inspectors. Fischer responded that Marshall would have to make do with the people

6

she had because Fischer did not want to bring new employees on board with the project nearing winter layoff.[4]  Fischer also told Marshall that she should "go out there."  Marshall explained that she already was, but that he had assigned her a number of other duties as well.  From mid-November onward, Marshall persisted in asking Fischer to hire more coating inspectors every day or two.

Fischer wanted Marshall to check in with him every day to let him know what she would be doing.  Marshall believed this was unnecessary and claims she told him so.  At the same time, she claims that such check-ins were never part of her job.

At one point, a disagreement also arose between Fischer and Marshall with respect to proper storage of coating materials.  When the temperature dropped below 50 degrees, Marshall asked Fischer for a "reefer trailer" to keep the coating material in a controlled environment.  Although Fischer agreed to get a trailer, he did not do so for approximately a month, meaning that some of the coating went bad.  Fischer allegedly became angry at Marshall when this happened.

Whenever rainouts occurred, all the foremen would go home for the day, but Fischer would require Marshall to stay and work on non-Dominion matters.  Marshall testified that she believed this jeopardized her credentials as an NACE inspector.  At some point, she informed Fischer, Cameron Klein and Bobby Poteete of her fears.

None of the above issues were a problem when Ross was Marshall's supervisor.

---

[4] Marshall also "believed that Fischer felt" two of the coating inspectors she had hired were overpaid. (Pl.'s Resp. DPFOF (dkt. #53) ¶ 34.)

7

### 4. Pay Disparity and Marshall's Complaints

Fischer was not involved in the decision to give raises to new foremen on the Dominion Waynesburg project based on their move to installing larger pipes.  In fact, it occurred before he became Superintendent.   At some point after Fischer became Superintendent, however, Marshall learned that foremen JJ McCollum, John McCollum and Steve Dobbs were earning more money than she was earning.  She was unhappy about this, believing that she ought to be earning more in light of the duties she had taken on since Fischer became Superintendent.

Marshall first complained about her pay to Fischer, but he refused to give her a raise. Specifically, Marshall claims she asked Fischer why she was making less than the other foremen and told him that the other duties she was performing were not those of a corrosion or coating specialist.  Fischer allegedly responded, "Sorry about your luck; this is the way things are going to be run now."  (*See* Def.'s Resp. PPFOF (dkt. #58) ¶ 13.)

Two days later, Marshall approached Holley.  They met in person on December 2, 2011, and Marshall told Holley that she wanted to be making the same as the foremen. The details of that conversation are settled, but the parties strenuously disagree as to the inferences to be drawn from the conversation.  Apparently, Marshall asked Holley to give her the same pay raise as "the other foremen."  (*See* Marshall Dep. (dkt. #50) 148:1-2, 11-15.)  She later testified that she actually said she wanted "the same raise as the rest of the guys" during that conversation.  (*Id.* at 155:25.)  When asked to explain that request further, she testified:

> Q     When you went to Skip to talk about the raise, you said
> you wanted the same raise as the guys?

8

A       Yes.

Q       Did you consider that to be a complaint that you weren't getting the raise because you were a woman or is it just the fact that the four people with the foreman title got it and you didn't?

A       The people that got the foreman's title got it and I didn't.

Q       And it so happens that the people with the foreman's title happened to be all men?

A       I was the only female there.  That's why I said guys.

(*Id.* at 203:1-12.)  This conversation with Holley is apparently the only time at which Marshall allegedly complained of sex discrimination in the workplace.

In response, Holley agreed to give Marshall a pay raise of $400 per week.  As of the week of December 5, 2011, Marshall began earning $4,201.00 per week, plus $500.00 for working on Sunday.  Marshall apparently assumed that this raise would be retroactive to August of 2011, but she never asked Holley to make the raise retroactive, even after she noticed it was not.

Marshall does not know what, if anything, Holley ultimately told Fischer about their conversation on December 2, 2011.  There is no evidence that Fischer ever knew the substance of Marshall's conversation with Holley, nor is there evidence that he was ever aware of Marshall complaining that her wages were the result of sex discrimination.  At some point the following week, however, Fischer learned that Marshall had asked Holley for a pay raise and told her that she needed to go through Fischer on issues like pay raises.  Fischer also became angry, yelling at Marshall and telling her that she worked for him and anything she told Holley would eventually reach Fischer.

Marshall further testified that not long after she received her pay raise, Fischer's demeanor changed.  He began to belittle her in front of groups and at morning meetings, as well as criticize her for trying to do her job correctly.  Various other employees attended these meetings, but Marshall has not offered any testimony from those employees with respect to what they heard or observed.

### 5.  Suspension and Reopening of the Project

On or about December 21, 2011, Fischer told Marshall to lay off Hodge and Reed, the two NACE coating inspectors she had hired.  Marshall did so.  Fischer then informed Marshall she needed to catch up on road bonds and permits.

The next day, December 22, the Dominion Waynesburg project was suspended for a ten-day holiday break.  With the exception of the Superintendent and some office workers, all Precision Pipeline workers on that project were laid off during the holiday break, including Marshall.  Due to a strike by the Teamsters Union that lasted from January 2 until January 12, 2012, the Dominion Waynesburg project remained suspended after the scheduled break for an additional ten days.

On or about January 3, Marshall began receiving e-mails pertaining to "one-calls" for the Pennsylvania and West Virginia projects.  Marshall called Amanda Fischer, Russ Fischer's wife, and asked why she was receiving those e-mails.  Amanda Fischer responded that Russ had her forward them to Marshall.  Because she had not yet been called back to work, Marshall asked Amanda to stop sending the e-mails, but she continued to receive them anyway.

On January 13, Fischer called Marshall back from the layoff and told her to inform coating inspector Brennan that he should return to work on January 16.  Brennan was the only coating inspector that Fischer called back.  At the time, he told Marshall they would be starting up with small crews in January as part of what Marshall speculated was "a money thing" preventing Fischer from bringing back all the coating inspectors.  Fischer also told Marshall they were not going to bring on any new coating inspectors and would have to make do with what they had for a while.  Fischer has averred that the reason he staggered the recall of employees was because the project needed to ramp back up after the layoff.  Thus, to save money, he waited to recall each employee until there was enough work to justify bringing the employee back.[5]

After her return from layoff, Marshall was out in the field performing coating inspection and paperwork almost 100% of the time.  At one point, Marshall confronted Fischer in a foreman meeting about the number of coating inspectors on the project.  At that meeting, the foremen of all five crews stated where they were going to be for the day.  Trying to make the point that complete coverage was not possible with five crews and just two certified inspectors, Marshall specifically asked Fischer where he wanted *her* to go that day.

On January 18, Marshall also expressed concern that the Dominion Waynesburg project needed more certified coating inspectors.  She was then informed that Fischer was bringing in two new coating inspectors, Josh Nelson and Zach Taylor.  Taylor arrived at the project on January 19; Nelson arrived on January 23.  On January 30, Rodney Dennis, a

---

[5] Marshall purports to dispute Fischer's motivation, but offered no *evidence* putting it into dispute other than her own surmising.  For reasons explained below, even if the court were to infer an untoward motive, it would not alter the outcome in this case.

NACE-certified laborer, joined the Dominion Waynesburg project as well.  After a day of training, Dennis was also able to join a crew and perform coating inspection work.  Thus, despite the fact the project had reopened with small crews, by the end of January there were six NACE-certified employees able to perform inspections on the Dominion Waynesburg project -- the same number as had been performing inspections before the layoff.  Still, Marshall was not satisfied.  She wanted Fischer to hire more coating inspectors in anticipation of a new project.

### 6. Problems after Reopening

After the layoff, a problem arose with missing paperwork.  Specifically, in December, Fischer laid off JJ McCollum, who failed to turn in all his paperwork before leaving.  Fischer had not told Marshall that McCollum was going to be laid off, meaning that Marshall had no chance to ensure McCollum got his paperwork in before leaving.  Without McCollum's paperwork, Precision Pipeline was unable to determine whether all inspections had been completed, meaning that some pipes had to be recoated.  Obviously, this affected not only Marshall but also the rest of the crew.  Marshall was upset with the way the situation was handled; she believed that Fischer had "tied her hands" by letting McCollum go without consulting her.  Marshall was also unhappy that Fischer and Dominion had settled on a solution to the missing paperwork without consulting her.

Marshall further felt that Fischer was unwisely cutting corners by failing to place NACE-certified inspectors at all sites, which led Dominion to request that Precision Pipeline redo coating work.  There is no dispute that Fischer was not purposefully trying to force the crews to redo work, nor did he benefit in any way from having the work redone.

12

Nevertheless, due to Fischer's decision, Dominion ultimately required Precision Pipeline to take off rockshield, "re-jeep" pipe and fix numerous "holidays" (potential defects).

Dominion also refused to sign off on paperwork because it was not complete. Marshall testified that the number of "holidays" increased until Brennan had to cover for Marshall whenever Fischer wanted her to perform "one-calls," which were outside of her ordinary job description. Marshall testified that leaving tasks undone jeopardized her certification and that she was worried about her integrity as a coating person. Furthermore, Fischer's decision to deny Rodney Dennis the use of a pickup truck hindered Marshall's ability to ensure all coating work was properly inspected and documented, although Marshall placed Dennis with a crew that ensured he got to the job site.

As of January 26, Marshall had not yet received the missing paperwork from JJ McCollum. Inspection work was ramping up, and Marshall had no way of catching up and starting new projects as well. Dominion held a meeting and instructed Precision to handle the situation. When Marshall tried to speak to Fischer about it, however, Fischer simply told Marshall that she would be receiving another coating inspector on January 30, 2012.[6]

On or about February 3, Fischer called Marshall to say he needed a NACE coating inspector in a location that had not been discussed earlier at the foreman meeting. Marshall did not receive the call, however, due to a lack of cell phone reception. Later that day, Fischer texted Marshall and instructed her to get in touch with him. In response, Marshall asked Fischer to meet her in the yard for a discussion, which turned heated. Yelling, Fischer informed Marshall that the coating inspection issues were her problem. Marshall believed

---

[6] Apparently, Fischer was referring to a laborer, who had just completed his NACE course the previous month.

13

that Fischer's ego was a problem.   Marshall particularly disliked that he tried to tell her what to do.   Because she reported to different supervisors on other projects, Marshall believed Fischer did not have that authority.   Ultimately, Marshall felt that Fischer was "going out of his way to make it impossible" for her to fulfill her job duties.

### D. Marshall's Resignation

At 5:30 a.m. the next day, February 4, 2012, Marshall came in early to speak to Fischer about what had happened the previous day.   Fischer refused to speak to her, instead speaking to the others who were present.   Marshall then announced at the 6:00 a.m. foreman meeting that it would be her last day of work.

Before her announcement, Marshall had told no one that she was thinking of resigning from Precision Pipeline.   At some point, Marshall told Holley and Taylor that Fischer was "making her life miserable," but it is unclear whether these conversations took place before or after she announced her resignation.

For purposes of summary judgment, the parties agree that Marshall had several reasons for leaving her job with Precision Pipeline.   For example, Marshall felt she was being required to spend too much time performing coating inspections after the layoff and not enough time performing her other duties.   As a result, Marshall was afraid that an internal audit might unfairly suggest she failed to do her job properly.   Even if not assigned blame, Marshall was worried that her reputation would suffer if she could not perform her job well because of an insufficient number of coating inspectors helping her.   She also feared that if Dominion were to receive a fine for anything coating-related, her NACE certification could be in jeopardy, although no one ever warned her that her certification was at risk.   Finally,

14

Marshall felt that Fischer: (1) had asked her to perform duties that were not part of her job; (2) was rude to her by interrupting her in a foreman meeting; (3) had yelled at her during a safety meeting in front of Dominion employees; and (4) was "just not giving [her] the time of day." (Marshall Dep. Vol. 2 (dkt. #51) 207:3.)

### E. Aftermath of Marshall's Resignation

After her resignation, Marshall met with Greg Park at Dominion. Park offered Marshall a position with another company, one of Dominion's contractors called QIS. According to Marshall, Park told her she would be working on a Dominion project in Moundsville, Pennsylvania, overseeing Precision Pipeline coating inspectors' work. While she never received a formal, written offer, Marshall accepted the job on February 22, 2012.

Two days later, on February 24, Marshall received a call from Park, who rescinded the offer. Again according to Marshall, Park said that Fischer was "ballistic" and insisted that Park not give her the job, because it would be a "conflict of interest" for a former Precision Pipeline employee to oversee current employees' work. Marshall knows of others who have gone back and forth between the employ of Precision Pipeline and Dominion without raising conflict of interest concerns, however.

On February 25, Marshall e-mailed Precision Pipeline's Vice President Bobby Poteete, its President Steve Rooney and executives Dan Murphy and Jim Murphy with a threat of legal action. Marshall claimed in her e-mail that she had resigned because of Fischer's criticism, arrogance and "verbal attacks," and that the stress was making it impossible to do her job. This e-mail made no mention of Marshall's belief that the lack of coating specialists on the project had the potential to damage her reputation or jeopardize

her NACE certification.  While mentioning that she is a black female, Marshall's e-mail made no claim that Fischer was motivated by discriminatory animus.


OPINION

Plaintiff's amended complaint includes claims for sex and race discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Count I); retaliation for reporting race and sex discrimination, in violation of Title VII (Count II); racial discrimination and retaliation in violation of 42 U.S.C. § 1981 (Counts III and IV); tortious interference with contract (Count V); and tortious interference with business relations, expectations and advantage (Count VI).  Marshall has since acknowledged that she has no viable claims for discrimination or retaliation based upon race.  (*See, e.g.,* Pl.'s Resp. DPFOF (dkt. #53) ¶ 86.)  Accordingly, she has not only withdrawn Counts III and IV of her amended complaint but has also withdrawn any claim of race discrimination in violation of Title VII.  (*See* Jennifer L. Ciralsky Decl. Ex. A (dkt. #49-1); Marshall Dep. Vol. 2 (dkt. #51) 221:23-222:10.)  This leaves her claims for sex discrimination and retaliation under Title VII, as well as her state law tortious interference claims.  Precision Pipeline has moved for summary judgment on these remaining claims.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the initial burden is met for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323.

## I.  Evidentiary Issues

As a preliminary matter, Precision Pipeline challenges six of the twelve exhibits that Marshall has set forth in opposing summary judgment on hearsay grounds. Because "[a] party may not rely on inadmissible hearsay to avoid summary judgment," *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011), the court must resolve the question of each material exhibit's admissibility before moving on to consider the merits of the summary judgment motion.

#### A. Exhibit 1

Exhibit 1 is apparently a document prepared by Marshall detailing the chronology of events supporting her claims of discrimination.  (Barbara Kim Marshall Decl. (dkt. #54) ¶ 3; *id.* at Ex. 1 (dkt. #54-6).)   The chronology consists entirely of unsworn, out-of-court statements that Marshall appears to offer solely for the truth of the matter asserted in those statements, making them hearsay under Federal Rule of Evidence 801.  *See MMG Fin. Corp.*, 630 F.3d at 656 (describing unsworn letter from declarant as "classic hearsay"); Fed. R. Evid. 801(c).   Nor does it fit under any of the exceptions to the rule against hearsay articulated in Federal Rule of Evidence 803.[7]   And although Marshall attempts to defend the admissibility of certain other exhibits in her brief in opposition, she offers no basis to support the admissibility of Exhibit 1.  Accordingly, the court will not consider Exhibit 1, nor any of the proposed findings of fact for which no other evidence is cited in support.[8]

#### F. Exhibit 2

Exhibit 2 is a document prepared by Marshall's counsel, based on Marshall's own notes as shown in Exhibit 1; Exhibit 2 was used as the basis for Marshall's EEOC complaint in this case.  (Marshall Decl. (dkt. #54) ¶ 4; *id.* at Ex. 2 (dkt. #54-7).)

As Precision Pipeline accurately points out, this exhibit contains hearsay within hearsay.  *See United States v. Roth*, 391 F.2d 507, 509-10 (7th Cir. 1967) (hearsay within

---

[7] This is not to say that Exhibit 1 might not be offered for some other purpose with the proper foundation laid (*e.g.*, 803(1) (present sense impression) or 803(5) (recorded recollection)), only that plaintiff does not offer it under one of the recognized exceptions to the hearsay rule.

[8] It is certainly possible that other admissible evidence supports the findings of fact in question. However, district courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them."  *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003).  It is Marshall's responsibility to support each proposed finding of fact with *admissible* evidence, and where she has not done so, the court will not seek such evidence on her behalf.

hearsay when a confidential informant told an agent of the location of blenders, and the informant had himself "received the information from someone else rather than by means of his own observation").  Under Federal Rule of Evidence 805, such statements are admissible only when "each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805; *see Jordan v. Binns*, 712 F.3d 1123, 1127 (7th Cir. 2013) (statements "that comprise multiple levels of potential hearsay are admissible if each part is admissible") (quoting *United States v. Green*, 258 F.3d 683, 690 (7th Cir. 2001)).

Here, the court has already concluded that Marshall's underlying notes are inadmissible hearsay, which eliminates the possibility of admitting the second layer of hearsay as part of an admissible "chain," at least for purposes of offering the statements for the truth of the matter asserted.  Furthermore, even if Marshall's notes were admissible, notes of her attorney based on those same notes are not admissible under any exception to the hearsay rule.

### G. Exhibits 4 Through 7

Exhibits 4 through 7 represent copies of documents that Marshall received in response to a request she made to the EEOC under the Freedom of Information Act ("FOIA").  (Marshall Decl. (dkt. #54) ¶¶ 6-9.)  They purport to be notes made by an unidentified EEOC investigator in the course of interviews with Hubert Ross (dkt. #54-9), Craig Brennan (dkt. #54-10), Russ Fischer (dkt. #54-11) and Skip Holley (dkt. #54-12).

### i.    Authentication

As an initial matter, it is questionable whether Marshall's declaration alone is sufficient to authenticate these exhibits.  "To satisfy the requirement of authenticating or

identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."   Fed. R. Evid. 901(a). "Circumstantial evidence is of course sufficient to establish the authenticity of a document." *United States v. Clark*, 649 F.2d 534, 542 (7th Cir. 1981).   Here, however, all Marshall can aver is that she received the documents in response to a FOIA request.   There is nothing in *any* of the notes indicating who wrote them or when they were written.   Nor has Marshall included details as to the request she made or the FOIA response detailing what, exactly, it sent to Marshall in response to that request.   *See, e.g.*, *Sullivan v. Dollar Tree Stores, Inc.*, No. CV-07-5020-EFS, 2008 WL 1730079, at *2 (E.D. Wash. Apr. 10, 2008) (Dep't of Labor investigative narrative properly authenticated when it included cover page on DOL letterhead and a signature from a FOIA disclosure officer); *Smith v. Warren R. Gregory & Sons, Inc.*, No. IP99-1490-C-B/S, 2001 WL 1691640, at *10-11 (S.D. Ind. Nov. 21, 2001) (EEOC file would not be excluded as unauthenticated when proponent included EEOC's response to FOIA request signed by EEOC representative and indicating request was granted in its entirety).   With so little to go on, Marshall has not made even the "minimal showing" that these notes are what she claims them to be.   *Ragan v. Jeffboat, LLC*, 149 F. Supp. 2d 1053, 1062 (S.D. Ind. 2001) (citing Fed. R. Evid. 901(a)); *Smith v. City of Chi.*, 242 F.3d 737, 741 (7th Cir. 2001); *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1143 (7th Cir. 1994)).

### ii.    Hearsay

Even assuming without deciding that the notes *could* be properly authenticated under Rule 901, they are inadmissible for an entirely different reason.   Like Marshall's other exhibits, they are blatant hearsay within hearsay, comprised of the interviewer's recap of

20

each interviewee's statements, which Marshall offers for the truth of the matter asserted.  As already noted, parties may not rely on inadmissible hearsay to survive summary judgment. *MMG Fin. Corp.*, 630 F.3d at 656.   Marshall tries to save the notes from exclusion by arguing that the underlying statements are not hearsay as party-opponent admissions and that, even if they are, they are excepted from exclusion:  under Fed. R. Evid. 803(6), as records of a regularly-conducted activity; and under Fed. R. Evid. 803(8), as factual findings from a legally-authorized investigation.  The court briefly considers each argument in turn.

### (1)      Party Opponent Statement

Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay if it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"  Importantly, when a party relies on an agency relationship under this rule, that relationship must still be in existence at the time the statements are made for them to constitute admissions of a party-opponent.   *See Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 726-27 (7th Cir. 1996) (admissions were hearsay and properly excluded where they occurred four years after termination of agency relationship).

Marshall makes no proffer as to whether Ross, Brennan, Fischer and Holley spoke to the EEOC interviewer while the employment relationship existed.  Nor will the court make such an assumption -- particularly since it seems unlikely given Marshall's apparently abrupt departure from Precision Pipeline, the seasonal or episodic nature of its work, and the fact that the notes themselves suggest, at least in some instances, that the interviewees did *not* work for Precision Pipeline when they made the statements.  (*See, e.g.*, Ex. 6 (dkt. #54-11) (Fischer interview; "[n]o longer works for R but states that his position was as a

Superintendent").)  Without knowing when the statements were made and whether Ross, Brennan, Fischer and Holley were still employees of Precision Pipeline at that time, Rule 801(d)(2)(D) does not apply.

### (2)    Business Records Exception

Federal Rule of Evidence 803(6) excepts from exclusion business records, so long as all of the following criteria are met:

(A)    the record was made at or near the time by – or from information transmitted by – someone with knowledge;

(B)    the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C)    making the record was a regular practice of that activity;

(D)    all these conditions are shown by the testimony of a custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E)    neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

The court need not devote much time to this argument either.  As an initial matter, Marshall has failed to offer the testimony of a custodian or qualified witness as Rule 803(6)(D) requires.[9]  "Such testimony establishes the regular practices and procedures surrounding the creation of the records, the very elements that are necessary for a finding of trustworthiness."  *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1984).  More importantly, Marshall has made no proffer *at all* with respect to the first three criteria.  Her brief in opposition to summary judgment simply states in conclusory fashion, without

---

[9] In lieu of such testimony, Marshall could have submitted a certification under Rule 902(11) or (12), but she has not done so.

22

analysis or citation to authority, that Rule 803(6) renders the exhibits admissible.  This is simply insufficient.

### (3)    Factual Findings from a Legally-Authorized Investigation

Finally, Marshall asserts that the notes are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii).  That rule provides that such hearsay is excepted from exclusion in a civil case when it sets out "factual findings from a legally authorized investigation," so long as nothing about the circumstances indicates a lack of trustworthiness.  While closer to the mark, "it has been held that a transcript of a third party's statement generally does not constitute a 'factual finding.'"  *Jordan*, 712 F.3d at 1133-34 (citing *United States v. Ortiz*, 125 F.3d 630, 632 (8th Cir. 1997)); *United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir. 1994)).  Here, the interview notes essentially parrot the statements of third parties; they do not constitute the interviewer's own "factual findings."  Moreover, from a common-sense perspective, it makes little sense to call investigative notes that state no conclusions "factual findings."  *See City of N.Y. v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981) (interim report that declined to state conclusion on the most important question did not constitute "'findings' of an agency or official").

Marshall also ignores the fact that "[e]vidence reported in a government document is only admissible to the extent that the maker of [the] document could testify to that evidence were he present in court."  *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 839 (N.D. Ill. 2005) (quoting *In re Air Crash Disaster at Stapleton Int'l Airport*, 720 F. Supp. 1493, 1497 (D. Colo. 1989)).  In *Stolarczyk,* the plaintiff sought to offer handwritten notes from an EEOC investigator documenting statements purportedly made by Stolarczyk during an interview.  The District Court for the

Northern District of Illinois excluded the statements, noting that even if Rule 803(8) applied to the notes, the investigator would not be able to testify to the *content of the statements* that Stolarczyk made. *Id.* at 839. Likewise, "if the EEOC investigator were called as a witness at trial, the Court could not allow that individual to relate rank hearsay in the form of out-of-court statements made by an interested party and in reasonable anticipation of ensuing litigation." *Id.*; *see also Romero v. Nev. Dep't of Corr.*, No. 2:08-cv-808-JAD-VCF, 2013 WL 6206705, at *13 (D. Nev. Nov. 27, 2013) (reports inadmissible where they did not contain the recommendations or conclusions of the FBI but instead "[were] essentially informal transcripts of Almony and Potter's unsworn statements to the FBI").

Because Exhibits 4 through 7 are hearsay and Marshall has failed to point to any exception permitting their admission, the court will also not consider those exhibits in ruling on summary judgment. Furthermore, as above, any proposed factual findings premised on those exhibits alone will be disregarded, as will any purported disputes of fact that lack separate evidentiary support.

## II. Sex Discrimination

To support a claim of sex discrimination under Title VII, Marshall may rely on either the direct or indirect method of proof. *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009). Marshall does not explicitly indicate which method she intends to employ, but her brief relies entirely on circumstantial evidence of discrimination, which is a hallmark of the direct method. *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 674-75 (7th Cir. 2012). Accordingly, the court will analyze her claim under that framework.

24

"Under the direct method of proof, a plaintiff's claim survives summary judgment if she can demonstrate 'triable issues as to whether discrimination motivated the adverse employment action.'" *Darchak*, 580 F.3d at 631 (quoting *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)).  Not unusually, Marshall has offered no "smoking gun" evidence of discriminatory intent:  the Seventh Circuit has recognized that such evidence is difficult to come by.  *See id.*; *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 832 (7th Cir. 2005) ("It should not be surprising that in today's politically correct workplace such admissions are rarely, if ever, made or encountered.").  Instead, Marshall purports to rely entirely on circumstantial evidence to survive summary judgment, which is permissible so long as it "points 'directly to a discriminatory reason for the employer's action.'" *Good*, 673 F.3d at 675 (quoting *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003)).

Circumstantial evidence of discrimination generally falls into one of three categories:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Darchak*, 580 F.3d at 631 (quoting *Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted)).  Marshall argues that she has advanced sufficient evidence to satisfy all three categories.

### A. Ambiguous Statements and Behavior

Marshall's proffer with respect to this category of circumstantial evidence is essentially unsupported by the record, except for her own testimony.  For example, she relies

on the EEOC notes to support her contention that Brennan heard Fischer make negative remarks about women on the job site.  As discussed above, those notes are inadmissible hearsay.  (*See* discussion, *supra*, Section I.C.)   Marshall also contends that other staff members observed Fischer speaking to her in a disrespectful manner, but her only "proof" is her deposition testimony.  Marshall cannot testify on her coworkers' behalf as to what *they* observed and what conclusions *they* drew.  *Cf. Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 779 F. Supp. 2d 858, 875 (N.D. Ind. 2011) (affiant could testify to her own reliance but not to others' reliance).

This leaves Marshall's deposition testimony as to the condescending manner in which Fischer spoke to her, as well as his hostile treatment of her generally.  While such testimony is based on her personal knowledge and observations, and would therefore be admissible, it ultimately fails to support an inference of *sex discrimination*.  Marshall testified only that Fischer would become upset with and disrespectful toward her, and that she never saw him get upset "with any other *employees*."  (Marshall Dep. Vol. 1 (dkt. #51) 232:13-17 (emphasis added).)  Absent evidence that Marshall was the only female employee on the project, which does not appear to be the case,[10] this evidence is ambiguous at best and does not point toward discrimination based on a protected class.  *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012) (ambiguous comment that supervisor was "out to get" plaintiff was "devoid of any indication that [the supervisor's] alleged motivations were age related").  The mere fact that Marshall is female does not, in and of itself, transform generic hostility into sex discrimination.  *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302-03

---

[10]  For instance, Marshall testified that employees who observed Fischer speaking to her condescendingly included Amanda Fischer and Amber Satterlund.  (*See* Pl.'s PFOF (dkt. #52) ¶ 56.)

(7th Cir. 2004) (no claim for racial harassment where plaintiff "[did] not show any connection between the[] occurrences and his race," particularly where other evidence supports finding that "[h]is problems were not related to his race – they were related to him").

The remainder of Marshall's meager proffer as to Fischer's comments and actions fares no better.[11]    Primarily, she speculates as to Fischer's possible motivation for mistreating her, but inferences and opinions "must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).   Marshall has offered nothing that renders her opinion as to Fischer's motives anything more than speculation.   In particular, she fails to identify a single female employee besides herself that Fischer allegedly dismissed or mistreated.   To the contrary, the record merely reveals that Fischer dismissed at least one *male* employee, JJ McCollum.   Nor has Marshall identified any statements Fischer made disparaging her based on sex.

Instead, Marshall relies on her own "personal opinion" that this was Fischer's motivation.   (Marshall Dep. Vol. 1 (dkt. #51) 184:13-17.)   "Discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits

---

[11]   Marshall's wholly-unsupported, conclusory deposition testimony calling Fischer a "known misogynist" and accusing him of abusing his wife is inadmissible for lack of foundation.   Certainly, Marshall has no such personal knowledge.   Furthermore, her accusations of misogyny are vague and conclusory, with *no* evidence to support them.   As Precision Pipeline points out, Marshall also seeks to offer this "evidence" of Fischer's character in order to prove that he acted in accordance with the character in his treatment of her, which is prohibited under Federal Rule of Evidence 404(a).   Indeed, employment of wholly unsupported personal attacks as "evidence" in opposing summary judgment, particularly attacks of such a serious nature, by counsel for plaintiff is very disappointing, if not unethical.

speculating about the defendant's motives." *Visser*, 924 F.3d at 659.  Here, that is *all* that Marshall offers.

Finally, even presuming that Marshall *had* offered admissible evidence of Fischer's statements and behavior, that evidence would be of limited value in proving discrimination, because the alleged pay disparity of which she principally complains arose well before Fischer arrived at the Dominion Waynesburg project.  Fischer took over as Marshall's supervisor on November 12, 2011, but Marshall was initially denied a raise months earlier, in *August*.  The fact that the alleged discrimination apparently took place before the arrival of the *only* person alleged to have displayed discriminatory animus obviously undermines Marshall's theory that her lower pay was based on her sex.  *See Fleishman,* 698 F.3d at 605 ("a nondecisionmaker's animus is not evidence that the employer's actions were on account of the plaintiff's [membership in a protected class]").[12]

### B.  Evidence that Similarly Situated Employees Received Systematically Better Treatment

Marshall next argues that, as a *de facto* foreman, she was similarly situated to the other foremen but did not receive the "recognition or pay" that they received.  "Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not have identical employment files."  *Good*, 673 F.3d at 675 (internal quotation marks omitted) (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)).  "In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in

---

[12] Of course, Fischer himself later denied Marshall a raise at her request, so this flaw alone is not fatal to her case, but it certainly weakens any connection between Fischer's alleged animus and the wage discrimination of which she complains, especially when there were other viable reasons to explain the denial of that request, as described above.

similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). "This is not a 'magic formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Id.* (quoting *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). The ultimate question is whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [she] was singled out for worse treatment." *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006).

The record certainly establishes that Marshall shared a number of supervisory responsibilities with foremen on the job, even if she was not *technically* a foreman herself. For example, Marshall attended the foreman's meetings and was responsible for placing the other coating inspectors on various crews. Furthermore, despite defendant's contention that Marshall did not supervise other employees, she does appear to have had at least some supervisory authority. For example, she had to ensure crews were adhering to contract specifications and handled any safety issues arising with respect to coating inspectors.

There are also some undisputed *differences* between her responsibilities and those of the other foremen. For instance, her job title throughout her employment was not "foreman" but "Coating Specialist," although Marshall has submitted a number of daily time reports from the Waynesburg Dominion project apparently designating her as foreman. (*See* Marshall Dep. Ex. 25 (dkt. #51-2).) Marshall also did not perform *all* of the typical duties of a foreman -- for instance, she could not discipline or terminate other employees. But those differences alone would likely not undermine the use of the other

foremen as comparators.  Indeed, the Seventh Circuit has emphasized the similarly-situated inquiry is meant to be flexible, and defendant has presented little evidence that Marshall's role on the Dominion Waynesburg project was sufficiently different from that of a foreman to render the proffered comparators "effectively useless" in the discrimination inquiry.  *See Coleman*, 667 F.3d at 846.

The main problem with Marshall's proof is not with her comparators, but with her failure to present evidence that male foremen *in general* received "systematically better treatment" than she did.  Certainly, Marshall has established that foremen *who came to the project from a smaller project in West Virginia* received raises in August of 2011, to achieve parity with the salaries of other the foremen who generally worked with larger pipe sizes, like that on the Dominion Waynesburg project.  Marshall has not, however, presented evidence (or even proposed any facts) indicating that *all* foremen received raises.  Her concession that the raises were based upon the move from West Virginia to Waynesburg tends to suggest that, like her, the other foremen already on the job received no raise.

Even more importantly, Marshall provides *no* evidence of anyone's pay but her own.  As a result, it is entirely possible that Marshall made *more* money than any of the foremen on the Dominion project.  While a plaintiff's evidence need not be "rigorously statistical" to support an inference of discrimination, *Darchak*, 580 F.3d at 631, it must at least "point[] 'directly to a discriminatory reason for the employer's action,'" *Good*, 673 F.3d at 675 (quoting *Cerutti*, 349 F.3d at 1061).  Here, the dearth of information Marshall offers with respect to salary wholly fails to support her allegations of systemic favoritism of male foremen.

30

Finally, Marshall claims she did not receive the same "recognition" as other foremen but does not explain what she means by this conclusory assertion.  Outside of the alleged pay disparity, the only obvious difference is the official *title* of "foreman," but the court has found no case law suggesting that a different job title alone evinces systematically discriminatory treatment, and Marshall herself has offered none.  Nor has she offered any evidence that the title of "Coating Specialist" is in any way inferior to that of foreman.  Accordingly, the court finds that Marshall has failed to produce evidence of systematic favoritism toward men.

### C. Evidence that Marshall Was Denied a Raise for Pretextual Reasons

Finally, Marshall points to the fact that she was initially denied a raise that other male foremen received.  In response, Precision Pipeline offered evidence that Marshall did not receive a raise because: (1) she was not a foreman; and (2) she did not arrive on the project from West Virginia, like the foremen who *did* receive raises.  As previously discussed, both are legitimate, non-discriminatory reasons requiring Marshall to adduce evidence of pretext -- that is, she must offer evidence that Precision Pipeline's "explanation was designed to obscure the unlawful discriminatory employment action."  *Jordan*, 396 F.3d at 834 (quoting *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 629 (7th Cir. 1996)).  The operative question, then, is not whether Precision Pipeline's reason for denying Marshall a raise was fair or well-considered; this court "do[es] not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision."  *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).  The question is whether Precision Pipeline's articulated reasons were lies.  *Id.*

31

Marshall points to one fact that arguably supports her pretext claim:  the fact that Holley immediately granted her a raise when she asked for it.  Viewing this fact in the light most favorable to Marshall, a reasonable jury might infer that her purported "ineligibility" for higher pay was not Precision Pipeline's real reason for denying her a raise, given that it promptly abandoned that justification when she challenged her pay.  Even when a plaintiff has marshaled enough evidence to show pretext, however, that showing may not be enough to support a claim of discrimination.  *See Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 298 (7th Cir. 2010).  "Evidence offered under the direct method 'must allow a jury to infer more than pretext; it must *itself* show that the decisionmaker acted because of the prohibited animus.'"  *Id.* (emphasis added) (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003)).  Granting Marshall the benefit of the most favorable inference possible, she may have shown that Precision Pipeline's reasoning was flimsy, but she fails at the second step by failing to identify anything in the record that suggests Precision Pipeline's *actual* reasoning was discriminatory.  *See Hobbs v. City of Chi.*, 573 F.3d 454, 462 (7th Cir. 2009) (plaintiff must show both pretext *and* that "the real reason is based on discriminatory intent").

In the end, Marshall has offered almost nothing to support her discrimination claim. She has no admissible evidence of statements or behavior demonstrating animus; no evidence that men were systematically treated more favorably; and only the weakest evidence of pretext, without corresponding evidence showing that that pretext was intended to mask *discrimination*.  On this record, "one might guess or speculate that perhaps [Marshall's sex] might have made a difference in the decision," but "guesswork and speculation are not enough to avoid summary judgment."  *Good*, 673 F.3d at 675.

Accordingly, the court will grant Precision Pipeline's motion for summary judgment on Marshall's sex discrimination claim.

## III. Retaliation

Marshall separately claims that Precision Pipeline retaliated against her by constructively discharging her in retaliation for her complaint of sex discrimination, which is also prohibited by Title VII. The evidence of retaliation is no stronger than that of sex discrimination.

Again, Marshall may proceed under either the direct or indirect method of proof, *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006), and again, Marshall has apparently elected to proceed under only the direct method. To survive summary judgment, she "must present direct evidence that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004).

Here, Marshall has presented evidence to show that she informally complained to Holley about her entitlement to a pay increase based on the raise offered foremen transferred from smaller pipeline projects. Lodging an internal complaint, even an informal one, may constitute protected activity. *See Tomanovich*, 457 F.3d at 663; *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). At the same time, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient," *Tomanovich*, 457 F.3d at 663. At most, Marshall's testimony is that she asked for the same raise as "the other foremen," or for the same raise as "the guys." Although the term

33

"foremen" could have been construed as gender neutral and Marshall referred to her coworkers as "guys" more than 40 times during her deposition, suggesting that she also used that term to refer to coworkers in general rather than to her male coworkers in particular, it still might arguably allow a jury to infer that she had complained about sex discrimination.

Presuming without deciding that Marshall's evidence could clear the first hurdle, she has failed to put forth sufficient evidence for a reasonable trier of fact to find an adverse employment action, much less that it was caused by her vague complaint of sex discrimination. Marshall alleges that Fischer's actions resulted in her constructive discharge, which, if true, constitutes an adverse employment action. *See Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1032 (7th Cir. 2004). Constructive discharge occurs when an employee is "forced to resign because her working conditions, from the standpoint of the reasonable employee, [have] become unbearable."[13] *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). "Working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because in the ordinary case an employee is expected to remain employed while seeking redress." *Williams*, 361 F.3d at 1034 (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000)).

Crediting all of the admissible evidence Marshall has offered, she has not demonstrated a work environment "so extraordinary that [s]he had no duty to remain employed while allowing management to address [her] concerns." *Id.* At most, a reasonable jury might find that Fischer behaved with a confrontational attitude toward Marshall from

---

[13] The Seventh Circuit has recognized two forms of constructive discharge, both of which require unendurable or intolerable working conditions. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The first occurs when the employee resigns due to discriminatory harassment. *Id.* The second occurs when "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (quoting *Univ. of Chi. Hosps.*, 276 F.3d at 332). Marshall appears to allege only the first form of constructive discharge here.

the beginning of his time on the project.  For example, he required Marshall to check in with him and gave her additional duties that prevented her from accomplishing the tasks she believed to be most important.  Fischer further disagreed with respect to the number of coating inspectors necessary to handle the project, refused to hire additional coating inspectors at Marshall's request and belittled and criticized her in front of others at some meetings.  Fischer also required Marshall to work on non-Dominion projects during rainouts and cut corners such that crews ended up needing to repeat work.   Finally, Marshall apparently felt that some of Fischer's decisions jeopardized her NACE certifications and reputation as a coating inspector, including making a decision regarding missing paperwork without Marshall's input, although she points to nothing proving that fear was objectively reasonable, which limits its value in the analysis somewhat.  *See Tutman*, 209 F.3d at 1050 (objective reasonable person standard applies); *Rabinovitz v. Pena*, 89 F.3d 482, 489-90 (7th Cir. 1996) (affirming summary judgment on constructive discharge claim; "only an unreasonably sensitive employee would feel compelled to resign after hearing such a remark").

Even assuming all of this were accepted as fact for purposes of summary judgment, something more is usually required to proceed on a claim of constructive discharge, as Precision Pipeline points out.  For example, in *Taylor v. Western and Southern Life Insurance Co.*, 966 F.2d 1188 (7th Cir. 1992), the court found constructive discharge "when the plaintiffs' boss constantly peppered the plaintiffs with racist comments, brandished a pistol and held it to one plaintiff's head." *Tutman*, 209 F.3d at 1050 (quoting *Taylor*, 966 F.2d at 1191).  In *Neal v. Honeywell Inc.*, 191 F.3d 827 (7th Cir. 1999), the Seventh Circuit concluded that substantial evidence supported a jury verdict of constructive discharge where

35

almost all the plaintiff's duties were taken from her, her immediate supervisor repeatedly insinuated that she was a traitor for whistleblowing, and her employer could not guarantee her safety against multiple public threats made by another employee.   And in *Patton v. Keystone RV Co.*, 455 F.3d 812 (7th Cir. 2006), the Seventh Circuit held that a reasonable trier of fact could find constructive discharge where there was evidence that the plaintiff's supervisor was obsessed with her and was both capable and desirous of physically assaulting her.   *Id.* at 818; *see also Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (egregious conduct for constructive discharge purposes existed based on "repeated use of a noose – perhaps the ultimate symbol of racial hatred and hate crimes – combined with implied threats of physical violence").

By way of contrast, in cases like *Rabinovitz v. Pena*, 89 F.3d 482, the plaintiff endured a lowered performance rating, workplace restrictions, refusal of a request to start work early and a suspiciously-timed business trip, which the Seventh Circuit held at most "suggest[ed] that friction existed between Rabinovitz and his supervisors, not that his job was so intolerable that he was forced to resign."   *Id.* at 489.   Similarly, in *Harriston v. Chicago Tribune Co.*, 992 F.2d 697 (7th Cir. 1993), a plaintiff was found not to have established a claim for constructive discharge despite being "subjected to such forms of discrimination as being excluded from office activities, being reprimanded without reason, and being given one of the least lucrative sales territories, as well as not being assigned new accounts, not being allowed to supervise two white employees, and not being assisted by [her manager]." *Id.* at 705.   And in *Patton v. Indianapolis Public School Board*, 276 F.3d 334 (7th Cir. 2002), the plaintiff failed to meet even the lower standard for hostile work environment, let alone constructive discharge, when she alleged that her supervisor "treated her in a rude, abrupt,

and arrogant manner, ignored her work-related suggestions and failed to keep her informed about changes at work." *Id.* at 339.

Even viewing the facts in the light most favorable to Marshall, her work environment is no more intolerable then the latter set of constructive discharge cases and does not approach those found in the former.  Marshall's repeated disagreements with Fischer, his disrespectful behavior and her increased job responsibilities may have made her work environment unpleasant, but it was not so extraordinary that she had no duty to allow management to address her concerns.  Certainly, her fears of losing her NACE certification or positive reputation in the industry are somewhat more compelling, but Marshall has both failed to present evidence that an objectively reasonable employee in her position would have held such beliefs, and has pointed to no instance where she took steps to prevent that risk short of quitting -- whether by contemporaneously documenting Fischer's behavior or by taking her concerns up the ladder within Precision Pipeline.  Worst case scenario, Marshall might have taken her concerns to Dominion or even to NACE.  And she has cited to no cases supporting a claim for constructive discharge in circumstances like these.

Finally, even if Marshall could show that her working conditions were sufficiently intolerable for a jury to find constructive discharge, she offer no evidence that the "discharge" occurred "*because of* [her] membership in a protected class."  *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996) (emphasis added).  As importantly, Precision Pipeline raises this very point in its brief in support of summary judgment, and Marshall has failed entirely to respond.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

Marshall offers no evidence of any causal connection between her allegedly protected activity in speaking to Holley about a raise and Fischer's later actions, except perhaps Fischer telling her not to go over his head again. She also cites *no* case law supporting the finding of a causal connection on such weak facts. Ultimately, her only "argument" on this point consists of recitations of her proposed findings of fact, none of which support any inference of causation.

As noted, the one fact Marshall offers supporting causation is her testimony that Fischer's demeanor toward her changed shortly after she received a pay raise from Holley, and even that discussion is rendered suspect by her assertion that he was hostile toward her even before she made any complaint to Holley about her pay. Indeed, she maintains Fischer was hostile from the outset of their relationship.

Moreover, the "mere temporal proximity between the [protected activity] and the action alleged to have been taken in retaliation . . . will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). There must also be, at a minimum, evidence that "the person who decided to impose the adverse action knew of the protected conduct," *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005), but here there is *no* evidence that Fischer ever knew Marshall had engaged in protected activity. At most, the evidence shows that Fischer knew Marshall asked for and received a raise, not that she mentioned to Holley that raises had been given "the guys," much less that *Fischer* denied her a raise because of her sex. As discussed above, merely complaining of discrimination without connecting that complaint to membership in a protected class does not constitute protected activity. Accordingly,

Marshall's retaliation claim fails on multiple levels, and Precision Pipeline is entitled to summary judgment on that claim.

## IV. Tortious Interference

Having granted summary judgment to Precision Pipeline on all of Marshall's Title VII claims, the court is left with two state law tort claims. Ordinarily, "when all federal-law claims are dismissed before trial, the pendent claims should be left to the state courts." *Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994). There are, however, "three well-recognized exceptions to this general rule": (1) when the statute of limitations has run on the pendent claim; (2) when substantial judicial resources have already been committed such that sending the pendent claim to state court will cause a "substantial duplication of effort"; and (3) when it is "absolutely clear how the pendent claims can be decided." *Id.* at 1251-52. In making the discretionary decision whether to retain jurisdiction over pendent claims, "a district court should consider and weigh the factors of judicial economy, convenience, fairness and comity [.]" *Id.* at 1251.

Here, recent precedent strongly suggests that the two-year statute of limitations for intentional torts, Wis. Stat. § 893.57, applies to Marshall's claims for tortious interference. *See Tilstra v. Bou-Matic, LLC*, 1 F. Supp. 3d 900, 909 (W.D. Wis. 2014); *Mirbeau of Geneva Lake, LLC v. City of Lake Geneva*, 746 F. Supp. 2d 1000, 1015 (E.D. Wis. 2010). *But see Elbe v. Wausau Hosp. Ctr.*, 606 F. Supp. 1491, 1503 (W.D. Wis. 1985) (holding that six-year limitations period of Wis. Stat. § 893.53 applies to interference with contract claims).[14] In

---

[14] In *Elbe,* this court relied on *Segall v. Hurwitz*, 114 Wis. 2d 471, 487-88, 339 N.W.2d 333 (Ct. App. 1983), a decision that is likely no longer good law in light of changes to the relevant statute. *See Turner v. Sanoski*, 2010 WI App 92, ¶¶ 6-9, 327 Wis. 2d 503, 787 N.W.2d 429 (noting that *Segall* applied prior version of the statute and "has no applicability to the 1979 revised statute we are

this case, the injury of which Marshall complains occurred on February 24, 2012. Had she not filed the present action, the statute of limitations would have run by February 24, 2014. Pursuant to Wis. Stat. § 893.15(3), however, "[a] Wisconsin law limiting the time for commencement of an action on a Wisconsin cause of action is tolled from the period of commencement of the action in a non-Wisconsin forum until the time of its final disposition in that forum."[15]  Marshall filed this suit on June 24, 2013, meaning the statute of limitations on her tort claims was tolled at that time.

Although Marshall could likely still pursue her tortious interference claims in state court, other factors militate strongly in favor of deciding them now, including considerations of judicial economy and the obvious weakness of the claims themselves. As an initial matter, these claims arise out of the same basic facts as the Title VII claims and another court would have to expend judicial resources getting up to speed on the context surrounding Marshall's claims of tortious interference, if not the law. Additionally, the parties have devoted time and effort to teeing up the undisputed facts, and the court has already expended judicial resources ascertaining those facts and resolving the surrounding evidentiary issues. Ultimately, Marshall's response mustered little to no *admissible* evidence to support her claims before this court -- as Precision Pipeline points out, she relies almost exclusively on inadmissible hearsay discussed in detail above. As a result, her claims would fail in this court for that reason alone. Perhaps before the state court, Marshall would be able to remedy the deficiencies in the evidence she presented in response to defendant's

---

dealing with here"). Even assuming that *Elbe* remained good law, that would result in an even longer statute of limitations applying here, not a shorter one, meaning that there is no danger that a state court action would prove untimely.

[15] Wis. Stat. § 893.15(1) defines a "non-Wisconsin forum" as "all courts, state and federal, in states other than this state and federal courts in this state."

motion for summary judgment here, for example, by seeking direct testimony of witnesses with information material to her claim, rather than offering double-hearsay. But then Precision Pipeline would be forced to relitigate issues it has fairly ripened for summary judgment in this court. This is unfair to Precision Pipeline and would give Marshall an unwarranted second opportunity to produce evidence supporting those claims, even though she utterly failed to do so at the "put up or shut up moment" in *this* lawsuit. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)) (internal quotation marks omitted).

Finally, Wisconsin state law does not permit a claim for tortious interference where a defendant was acting in its own business interest. *See Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516-17 (7th Cir. 1990) (no tortious interference when "one who has a financial interest in the business of a third party causes that person not to enter into a contract so long as wrongful means are not employed and the actor is protecting his interest in the relationship with the third party"). Precision Pipeline asserts that any supposed interference on its part in Marshall's proposed employment on behalf of Dominion -- as a supervisor of the very work Marshall walked away from under acrimonious circumstances -- was plainly in Precision Pipeline's best interest and, therefore, privileged. Moreover, Marshall musters neither contrary evidence nor case law in response to this assertion. Given that Marshall's remaining state law claims are essentially meritless on their face, the court will grant summary judgment on them as well.

## V. Sanctions

Finally, still pending before the court is Precision Pipeline's motion for sanctions based on Marshall's failure to timely respond to discovery requests and non-compliance with this court's order compelling production.  (Dkt. #40.)  In light of the court's ruling on summary judgment, Precision Pipeline's request for dismissal of this action as a sanction is now moot, as is its request that the court strike Marshall's request for emotional distress damages.  However, Precision Pipeline also sought an award of costs and attorney's fees, which the court addresses briefly below.

After Marshall's attorney, Janet L. Heins, failed to respond timely to Precision Pipeline's first set of discovery requests and did not acknowledge its repeated subsequent attempts to contact her to discuss scheduling Marshall's deposition and the overdue discovery, Precision Pipeline eventually filed a motion to compel.   That same day, Magistrate Judge Stephen Crocker issued an order setting a hearing on the motion to compel for August 14, 2014.  In part, that order read:

> If plaintiff actually has not yet provided responses to discovery served on May 27, 2014, then plaintiff must provide all requested discovery without objection before this hearing or the court *will* impose Rule 37(b) sanctions.  To the same effect, plaintiff had better make herself available for deposition sooner rather than later.

(Aug. 6, 2014 Order (dkt. #34) (emphasis added).)

On August 13, 2014, Heins finally responded, representing that personal matters had kept her from work.  She averred that she had fully complied with all discovery requests and had scheduled Marshall's deposition for August 22, 2014, and she asked that the court not impose sanctions.  The next day, she was unable to appear at the scheduled hearing on the

motion to compel, but Judge Crocker proceeded with the hearing to determine whether the dispute had in fact been resolved.  It became apparent at that hearing that despite Judge Crocker's earlier order, all responses were not provided "without objection."   On the contrary, Marshall refused to respond to Interrogatory No. 10, Request for Production No. 37 and Request for Production No. 29 on relevance grounds.  Judge Crocker held that the information was both relevant and discoverable and ordered Marshall to respond completely by midnight on August 18, 2014.  It appears that she finally met that deadline.

Under Federal Rule of Civil Procedure 37(b), a party's failure to obey an order to provide discovery permits the court to impose sanctions, including "striking pleadings in whole or in part" and "dismissing the action or proceeding in whole or in part."  Fed. R. Civ. P. 37(b)(2)(A)(iii), (v).  A party's failure to serve answers, objections or a written response to interrogatories or requests for inspection is also a basis for sanctions, which "may include any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."  Fed. R. Civ. P. 37(d)(1), (3).   The district court "has broad discretion in imposing sanctions."  *Tamari v. Bache & Co. (Leb.) S.A.L.*, 729 F.2d 469, 472 (7th Cir. 1984).

Heins asks the court to exercise that discretion to deny the request for sanctions in its entirety.  In support, she again points to her previous submissions, which refer to the personal matters that kept her out of work, and to the fact that she ultimately complied with the court's order in its entirety.  While the court credits her representations as to the personal issues she was experiencing, that does not explain her inaction from July 2, when defense counsel first contacted her for a response, to August 13.  Nor does it explain her non-compliance with Judge Crocker's order of August 6, when he ordered her to provide all requested discovery "without objection."   She characterizes the latter as a mistake, which

43

may well be true, given the rapidity with which she withdrew her objections once the problem was brought to her attention.   Still, the court finds that some sanction is appropriate for Hein's discovery violations.  *See e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 642-43 (7th Cir. 2011) ("e360's failure to comply with the district court's order was the result of at least negligence, which is a degree of fault sufficient for imposing sanctions."); *Tamari*, 729 F.2d at 473 ("culpability of a party who fails to comply with a court order determines only which sanctions the court should impose and not whether any sanctions are appropriate at all").

Accordingly, the court will sanction Heins $250, payable to Precision Pipeline, for her failure to participate in discovery and comply with Judge Crocker's order of August 6.[16] Ordinarily, Rule 37 would also require that Heins pay Precision Pipeline's actual costs and attorney's fees.   *See* Fed. R. Civ. P. 37(b)(2)(C); Fed. R. Civ. P. 37(d)(3).   However, the court is persuaded that the financial sanction, coupled with this public admonishment, is sufficient incentive for Heins to do better as an officer of the court in the future, making any further sanction unjust under all the circumstances.   Furthermore, imposing this further sanction eliminates the need for any party to expend further time and effort on briefing what fees are "reasonable."

ORDER

IT IS ORDERED that:

1) defendant Precision Pipeline LLC's motion for summary judgment (dkt. #44) is GRANTED;

---

[16] Because there is no suggestion that Marshall herself is at fault for the failure to participate in discovery, the court will not make her jointly and severally liable for the sanction.

2) defendant's motion for sanctions and attorney's fees (dkt. #40) is GRANTED IN PART and DENIED IN PART, consistent with the opinion above; and

3) the clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 14th day of January, 2015.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge